# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY PACIFICO, | CASE NO. 1:14-cv-01280-CCC-GBC |
| Plaintiff, | (JUDGE CONNER) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| | Docs. 1, 10, 11, 14, 15 |
| Defendant. | |

## REPORT AND RECOMMENDATION

### I.     Procedural Background

On December 23 and December 29, 2011, Anthony Pacifico ("Plaintiff")

filed as a pro se claimant for disability insurance benefits under Title XVI and II of

the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a last insured date

of December 31, 2011,[1] and claimed a disability onset date of June 30, 2011.

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being

(Administrative Transcript (hereinafter, "Tr."), 24).  On June 11, 2012, Plaintiff was appointed a non-attorney representative.  (Tr. 133).  After the claim was denied at the initial level of administrative review, the administrative law judge ("ALJ") held a hearing on February 7, 2013.  (Tr. 37-70).  On February 25, 2013, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 21-36).  On April 19, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 9-20), which the Appeals Council denied on May 9, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-7).  On July 2, 2014, Plaintiff secured representation from attorney Jonathan P. Foster.  (Tr. 1-4).

On July 2, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  (Doc. 1).  On November 5, 2014, the Court referred this case to the undersigned Magistrate Judge.  On November 24, 2014, the Commissioner

---

insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

("Defendant") filed an answer and an administrative transcript of proceedings. (Doc. 10, 11). On February, 13, 2015, Plaintiff filed a brief in support of the appeal. (Doc. 14 ("Pl. Brief")). On March 17, 2015, Defendant filed a brief in response. (Doc. 15 ("Def. Brief")). On June 12, 2015, Plaintiff indicated that he would not file a reply brief. (Doc. 17).

## II. Relevant Facts in the Record[2]

Plaintiff was born on October 24, 1980, and thus was classified by the regulations as a younger person through the date of the ALJ decision rendered on February 25, 2013. 20 C.F.R. § 404.1563 (c). Plaintiff alleges the following impairments: "recurrent arrhythmias, atrial fibrillation, chronic systolic heart failure, cardiomyopathy, right bundle block, status post right side ablation procedure in January 2013 with attendant debilitating fatigue, weakness, shortness of breath, headaches, joint and muscle pain, bilateral carpal tunnel syndrome and

---

[2] Plaintiff has submitted medical records after the ALJ's February 2013 decision. Plaintiff has not asserted any cause, much less good cause, for failing to obtain the medical opinion prior to the ALJ decision. In *Mathews,* the Court held that there was no good cause for the omission of an opinion created after the ALJ decision when the opinion could have been created before the ALJ decision. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). Thus, the Court did not consider the opinions and records submitted after the ALJ's decision and does not recommend remand pursuant to Sentence Six.

cardiac medications which have adverse side effects of fatigue." Pl. Brief at 1; (Tr. 26).

Plaintiff's past relevant work includes working as a drafting technician, which entails making drawings of industrial parts by hand and on the computer. (Tr. 31, 45). Plaintiff stopped working as a draft technician in 2006, because he was fired for sexual harassment. (Tr. 46). After collecting unemployment, he worked through a temporary agency while he waited to start college in 2008. (Tr. 46-47). Plaintiff attended college full-time through December 2012. (Tr. 30, 43). Although he received a couple of incompletes and had a couple more classes to finish up, he was graduating with a major in liberal studies and a minor in math. (Tr. 42). Plaintiff explained that he received the incompletes in his online classes because he struggled with classes on the computer, but he successfully completed the classes where he had to appear for class. (Tr. 43). During the time that he was in college full-time, he also maintained a part-time job as a tutor through the work-study program which he stopped because the school year ended. (Tr. 47, 84, 89, 180).

Earnings reports demonstrate the following annual earnings: 1) 1998: met earning threshold for four quarters of coverage,[3] totaling $2866; 2) 1999: met earning threshold for one quarter of coverage, totaling $1408.50; 3) 2000: met earning threshold for four quarters of coverage, totaling $12463.67; 4) 2001: met earning threshold for four quarters of coverage, totaling $19882.44; 5) 2002: met earning threshold for four quarters of coverage, totaling $20445.47; 6) 2003: met earning threshold for four quarters of coverage, totaling $21153.78; 7) 2004: met earning threshold for four quarters of coverage, totaling $22824.44; 8) 2005: met earning threshold for four quarters of coverage, totaling $23009.84; 9) 2006: met

---

[3] After 1977, the Commissioner of the Social Security Administration determines the amount of taxable earnings that will equal a "quarter coverage" for each year, an amount which is determined by using a formula in the Social Security Act that reflects a national percentage increase in average wages. 42 U.S.C.A. § 413; 20 C.F.R. § 404.140; 20 C.F.R. § Pt. 404, Subpt. B, App.; "Quarters of coverage," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 8:10 (2nd ed.) (list of earnings needed to earn one quarter of coverage for years from 1975 to 2012); *see also* "How do you earn Social Security credits?" http://www.ssa.gov/section218training /basic_course_3.htm#10 (last accessed July 29, 2015) (list of required earnings through 2015). In a claimant's earnings record, the letter "c" indicates that a claimant has earned enough to qualify for a quarter of coverage and the letter "n" indicates that the threshold amount for a quarter of coverage was not earned for a given quarter of that year. *See Understanding an earnings record*, 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.). For example, in 2004, "cccc" would indicate that a claimant has earned at least $900 each quarter of 2004 and "cccn" would indicate that a claimant earned at least $900 for each of the first three quarters of 2004. *See Understanding an earnings record*, 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.); *How do you earn Social Security credits?*, http://www.ssa.gov/section218training/basic_course_3.htm#10 (last accessed July 29, 2015).

earning threshold for four quarters of coverage, totaling $13435.30; 10) 2007: did

not meet earning threshold for any quarter of coverage, totaling $756.72; 11) 2008:

did not meet earning threshold for any quarter of coverage, totaling $176.98; 12)

did not earn any income from 2009 to 2012.  (Tr. 168, 172-75).

## A. Relevant Treatment History and Medical Opinions

### 1.  Sayre Cardiology: Pramod Deshmukh, M.D.; Mohamed Salem, M.D.

In a treatment record dated August 2, 2011, Dr. Salem noted that during a

routine pre-employment physical, Plaintiff discovered having an atrial fibrillation.

(Tr. 248).   Plaintiff reported that he recalled prior shortness of breath that he

attributed to allergies and occasionally felt sharp chest pain, but denied active

symptoms of angina chest pain, dyspnea, orthopnea, paroxysmal nocturnal

dyspnea, palpitation, dizziness, lightheadedness, abnormal sweating, syncope or

pre-syncope.  (Tr. 248).   Upon examination, Dr. Salem noted that Plaintiff's S1

and S2 heart sounds were normal.  (Tr. 244).   Dr. Salem noted that an irregular

rhythm and tachycardia was present.  (Tr. 244).   Dr. Salem observed that there was

no gallop, no friction rub, no murmur heard and that Plaintiff demonstrated normal

effort to breathe and breathing sounded normal.  (Tr. 244).   Dr. Salem concluded

that Plaintiff likely had a lone atrial fibrillation and that he was asymptomatic. (Tr. 244). Dr. Salem explained the prognosis and presented Plaintiff with the options of transesophageal echocardiogram ("TEE"), Electrical Cardioversion ("CV") or ablation, and recommended a stress echocardiogram to rule out structural heart disease, thyroid function and complete metabolic panel ("CMP"). (Tr. 244). Dr. Salem opined that there was no need to start anticoagulation given Plaintiff's "low risk profile" and would refer the matter for further evaluation after the test results become available. (Tr. 244).

On August 3, 2011, Plaintiff underwent an exercise stress echocardiogram test and Dr. Salem concluded the test was negative for ischemia. (Tr. 245). Plaintiff reported fatigue for the past two to three months and weekly headaches. (Tr. 246). Dr. Muhammad noted no chest-pains but palpitations during a pre-employment examination a month prior. (Tr. 246).

In a treatment record dated August 29, 2011, it was noted that Plaintiff was referred by Dr. Salem for "further management of atrial fibrillation/atrial flutter identified during job interview in . . . July." (Tr. 242). History of reported symptoms included shortness of breath and tiredness and it was noted that atrial

fibrillation onset was probably a few years prior. (Tr. 242). Dr. Deshmukh stated that upon review of Plaintiff's medical history and review of symptoms, a "comprehensive review of systems was negative except for as noted in the history of present illness/subjective." (Tr. 242). Upon examination Dr. Deshmukh noted of the hear that "S1, S2: regular rate, rhythm. S2: [normal]. S4: [normal]. Systolic ejection murmur present, grade 1/6." (Tr. 242).

Dr. Deshmukh also noted no edema, no arterial or venous insufficiency, no pigmentation changes, no variscosities. (Tr. 240). Dr. Deshmukh also determined that Plaintiff's echocardiogram and stress tests were normal. (Tr. 240). Dr. Deshmukh indicated his impression that Plaintiff had atrial flutter, atrial fibrillation, and obesity and that Plaintiff's condition was gradually worsening. (Tr. 240).

Dr. Deshmukh recommended that after Plaintiff was "therapeutically anticoagulated," he should proceed with admission to the hospital for a "monitored initiation of antiarrythmic [sic] therapy. Right sided ablation would then be performed to identify any reentrant arrythmias [sic] including atrial flutter and

ablate this circuit as well as any arrythmogenic [sic] triggers coming from the coronary sinus, septum, or crista terminalis." (Tr. 240).

An EKG test on August 29, 2011 by Dr. Deshmukh lists a diagnosis of "Artrial flutter with variable A-V block, Right bundle branch block; Abnormal ECG when compared with ECG of August 2, 2011; Atrial flutter has replaced Atrial fibrillation." (Tr. 328)

After Plaintiff underwent an ablation procedure, on January 22, 2013, Dr. Deshmukh restricted Plaintiff from any lifting, driving, or strenuous exercises for two days (Tr. 426).  Plaintiff was further instructed to follow-up with Dr. Deshmukh in March.  (Tr. 427).

In treatment record dated January 24, 2013, Dr. Deshmukh indicated that the following procedures were performed: Electrocardioversion; primary comprehensive electrophysiology study with left atrial record; intracardiac mapping; radiogrequency ablation of the right side isthmus and the septum; and, stimulation record after infusion of isoproterenol. (Tr. 451-453).

## 2.  Robert Packer Hospital: James Raftis, D.O.

In a treatment record dated September 23, 2011, Plaintiff sought emergency outpatient treatment for a sore throat, nasal and head congestion. (Tr. 252). Plaintiff denied any shortness of breath. (Tr. 252). Dr. Raftis noted unremarkable findings and noted that Plaintiff's symptoms were likely due to a viral upper respiratory infection. (Tr. 252).

### 3. PhysicianCare P.C.: Clarence Mast, Jr., M.D.

In a treatment record dated June 15, 2011, it was noted that Plaintiff had atrial fibrillation, EKG changes and flutter[4] (Tr. 280, 342). Plaintiff reported experiencing chest pain "sometimes" and shortness of breath upon exertion. (Tr. 280, 342). In a treatment record dated August 10, 2011, Plaintiff reported needing Nexiumn and allergy eye drops. (Tr. 279). In a treatment record dated November 10, 2011, Plaintiff sought treatment for his eyes and GERD and reported that he was denied Nexium to treat the GERD. (Tr. 278, 341). It was noted that Plaintiff experienced numbness of the arms and had no palpitations. (Tr. 278, 341). In a treatment record dated December 19, 2011, Plaintiff reported precordial chest pain,

---

[4] "A fib" stands for atrial fibrillation and  the Greek Delta symbol means "change."  Neil M. Davis, *Medical Abbreviations*, at 39, 352 (14th ed. 2009).

memory loss, and frequently experiencing cold hands. (Tr. 277, 339). Although partly illegible, objective findings reveal Plaintiff heart demonstrated a "RRR" (regular rate and rhythm), and otherwise unremarkable findings. (Tr. 277, 339). It was also noted that Plaintiff would follow up with a cardiologist within a month.

In "certificate to return to work/school" notes dated March 16, 2012, and June 19, 2012, Dr. Mast indicated that he had been treating Plaintiff since August 8, 2008, and wrote that Plaintiff was unable to work "ill since April 28, 2008." (Tr. 241, 317). On March 19, 2012, Plaintiff reported experiencing hand numbness and difficulty walking, and back pain. (Tr. 338).

In a cardiac residual functional capacity questionnaire dated January 29, 2013, Dr. Mast noted a diagnosis of atrial fibrillation, chronic systolic heart failure, RBBB, and cardiomyopathy with a "guarded" prognosis. (Tr. 428). As clinical support for his conclusions, Dr. Mast cites Plaintiff's EKG and other testing. (Tr. 428). Dr. Mast check boxes indicated that Plaintiff had the following symptoms: shortness of breath, fatigue, weakness, palpitations, and dizziness. (Tr. 428). Dr. Mast checked the box indicating that Plaintiff had "a marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on

ordinary physical activity, even though . . . patient is comfortable at rest." (Tr. 428). Without answering the question as to what role stress plays in bringing on Plaintiff's symptoms, Dr. Mast checked the box indicating that Plaintiff was "incapable of even 'low stress' jobs," and wrote as an explanation that Plaintiff has trouble lifting the garage door. (Tr. 428-29).

Dr. Mast indicated that physical symptoms and limitations did not "cause emotional difficulties such as depression or chronic anxiety" and explained that Plaintiff experienced extreme fatigue which was exacerbated when he became emotional. (Tr. 429). Dr. Mast also indicated that emotional factors contribute to the severity of Plaintiff's subjective symptoms and functional limitations. (Tr. 429). Dr. Mast indicated that during a typical workday, Plaintiff physical and psychological symptoms were severe enough to "constantly" interfere with attention and concentration needed to perform even simple work tasks. (Tr. 429).

Dr. Mast listed Plaintiff's prescribed medications and wrote that side effect was fatigue. (Tr. 429). Dr. Mast opined that Plaintiff could walk 100 feet without rest or severe pain. (Tr. 430). Dr. Mast further opined that within an eight-hour working day Plaintiff could sit less than two hours and could stand/walk less than

two hours, would need a job that permitted an unscheduled one-hour break, and permitted shifting at will from sitting, standing, or walking. (Tr.430). He stated that if Plaintiff worked a sedentary job he would need to keep his legs elevated two to four hours during the workday. (Tr. 430). Dr. Mast opined that Plaintiff could never lift ten pounds (Tr. 430).

Dr. Mast further checked boxes indicating that Plaintiff could "never" twist, stoop, crouch, climb ladders, climb stairs. (Tr. 430). Dr. Mast indicated that Plaint must avoid even moderate exposure to extreme cold, extreme heat, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, and avoid all exposure to chemicals. (Tr. 431). Dr. Mast stated that Plaintiff's impairments would likely produce "mostly bad days" and would result in Plaintiff missing more than four days of work per month. (Tr. 431). Dr. Mast also stated that Plaintiff experiences continuous pain in the right side, a continuous cough, and had one unsuccessful ablation procedure. (Tr. 431).

### 4. Arnot Medical Services

In treatment record dated August 8, 2008, it was noted that Plaintiff had an irregular heart beat and refused EKG tests due to no insurance, would attempt to

get insurance through his college and return to the office in a month for an EKG. (Tr. 281-82).

### 5. Mansfield University School: L. Perry, CRN

On February 11, 2010, Ms. Perry assessed Plaintiff with acute gastroenteritis. (Tr.331) On September 22, 2011, Plaintiff reported experiencing a sharp pain in his chest and that he was due for surgery during school break. (Tr. 332)

### 6. Memorial Hospital: Martin Mikaya, M.D.; Elizabeth Sobieraj, M.D.

On November 6, 2012, Plaintiff sought emergency treatment following a motor vehicle crash and reported chest pain and had a contusion on his chest. (Tr. 392). Plaintiff reported that he was struck head-on by another vehicle, the airbag deployed and hit him on the chest and mouth. (Tr. 392). Plaintiff reported that immediately after the crash he felt fine, but later the previous night developed sternal chest pain. (Tr. 392). Plaintiff denied experiencing any shortness of breath or dizziness. (Tr. 392). It is noted that Plaintiff had no history of prior surgeries, Dr. Mikaya observed that Plaintiff heart beat was at a regular rate and rhythm, had

normal breath sounds, no M/R/G[5], no respiratory distress, and no JVD.[6]  (Tr. 393).

In a radiology reported dated the same day, Dr. Sobieraj concluded that the MRI revealed a "[p]rominent right cardiac border, same as before" and recommended a cardiology consultation.  (Tr. 403).

In a report dated August 28, 2012, it was noted that on August 24, 2014, a verbal report was called to Dr. Thirumurth who advised that Plaintiff should seek emergency treatment for symptoms associated with test observations of his irregular heart rhythm.  (Tr. 405-407).

### 7.  Guthrie Clinic: Mary A. Romanyshyn, C.R.N.P.; Zara Babayan, M.D.; Anand Singla, M.D.; Pramod Deshmukh, M.D.

In a treatment record dated October 23, 2012, Plaintiff followed-up regarding his atrial flutter and to discuss ablation.  (Tr. 408). It was noted that his employer was the Family Dollar.  (Tr. 408).  In the report Ms. Romanyshyn wrote:

> Echocardiogram in 8/2012 revealed cardiomyopathy pattern with ejection fraction of 35-40%. Been on coumadin for 3 months now. Is therapeutically anticoagulated. Complaints of shortness of breath with exertion especially walking up the hills at Mansfield University where

---

[5] "Murmurs, rubs, and gallops."  Neil M. Davis, *Medical Abbreviations*, at 215 (14th ed. 2009).
[6] "Jugular Venous Distension." Neil M. Davis, *Medical Abbreviations*, at 181 (14th ed. 2009).

> he is a student. The onset of atrial fibrillation is not known. Remembers have a rapid heartbeat as a little boy? Weight is stable. Denies paroxysmal nocturnal dyspnea or edema. No chest pain. No palpitations.

(Tr. 408). Ms. Romanyshyn listed unspecified essential hypertension, nonischemic cardiomyopathy, chronic systolic heart failure, and right bundle branch block ("RBBB") as Plaintiff's diagnoses, which were confirmed by Dr/ Deshmukh. (Tr. 409, 424). Plaintiff indicated that he wanted to wait for "ep ablation" until after graduation. (Tr. 410). Ms. Romanyshyn opined that in the meantime, Plaintiff needed "aggressive medical management." (Tr. 410).

On December 20, 2012, Plaintiff sought follow-up treatment for his atrial fibrillation. (Tr. 413). Ms. Romanyshyn opined that Plaintiff "most likely has developed tachycardia cardiomyopathy secondary to [his atrial fibrillation]. (Tr. 413). Ms. Romanyshyn noted that Plaintiff's ejection fraction was 35 -40 % and Plaintiff reported feeling more tired. (Tr. 413). Upon evaluation, Ms. Romanyshyn noted that Plaintiff's heart beat at an irregular rate and rhythm. (Tr. 214).

On January 22, 2013, Plaintiff underwent a TEE test Drs. Singla and

Babayan noted as their final impression that Plaintiff was:

> in rapid atrial fibrillation at rate 120--130 bpm at the time of examination. Mild LVH with moderate global LV systolic dysfunction, LVEF 35-40%. No regional wall motion abnormalities. Mild RV di.lat.at.ion with mild systolic dysfunction. Bi-atrial enlargement. No thrombus in LA, or LAA. Atrial septal aneurysm with no shunts. Possibly quadricuspid aortic valve with trace aortic regurgitation. No other hemodynamically significant valvular stenosis or regurgitation. Pulmonary arterial systolic pressure cannot be accurately estimated from this study. No pericardial effusion.

(Tr. 455-56).

Drs. Singla and Babayan observed that: 1) left ventricular cavity size was normal; 2) left ventricular wall thickness was mildly increased; 3) no evidence of LVOT obstruction; 4) global systolic function is moderately reduced with estimated LV EF 35 percent to 40 per cent; 5) no regional wall motion abnormalities; 6) left and right atrium and right ventricle were mildly dilated; 7) left atrial appendage is normal in size with normal flow velocity; 8) no evidence of thrombus within left atrium or left atria1 appendage; 9) pulmonary veins had normal origins and flow pattern consistent with elevated LA pressure; 10) aneurysmal intra atrial septum; 11) interatrial septum appears intact by 2D

imaging, color Doppler and IV bubble interrogation; 12) no evidence of PFO or ASD; 13) mitral valve had mildly thickened but flexible leaflets; 14) there was trivial mitral regurgitation; 15) there is no mitral stenosis; 16) no vegetations or masses on mitral, aortic, tricuspid, or pulmonic valves; 17) aortic valve was probably quadricuspid with small rudimentary cusp between right and left coronary cusps; 18) normal leaflets mobility; 19) there was no aortic stenosis; 20) there was trace aortic regurgitation; 21) right had mildly reduced contractility; 22) tricuspid and pulmonic valves were structurally normal with flexible leaflets; 23) there is mild tricuspid regurgitation; 24) pulmonary arterial systolic pressure could not be accurately estimated at the time of the examination; 25) no pulmonic regurgitation; 26) no pericardial effusion; 27) aortic root size was normal; and 28) there was mild calcific atherosclerotic disease of aortic arch and descending aorta. (Tr. 456-57)

On January 27, 2013, Plaintiff underwent surgical procedures of: 1) electrocardioversion; 2) primary comprehensive electrophysiology study with left atrial record; 3) intracardiac mapping; 4) radiofrequency ablation of the right side isthmus and the septum; and, 5) stimulation record after infusion of isoproterenol.

(Tr. 451).  For medical history, it was noted that Plaintiff had a "long-standing atrial fibrillation/flutter" and had developed "mild" cardiomyopathy.  (Tr. 451).  It was also noted that it had been difficult to obtain adequate INR values and Plaintiff underwent a transesophageal echocardiogram examination.  (Tr. 451).  After the procedures, Dr. Deshmukh concluded: 1) successful cardioversion to normal sinus rhythm; 2) successful ablation of the right side isthmus and the septum; and, 3) noninducibility postablation.  (Tr. 453).  Dr. Deshmukh wrote that as a part of follow-up, Plaintiff would be offered "pulmonary vein isolation in an attempt to stop the Betapace therapy."  (Tr. 453).

### 8.  Sharon M. Wander, M.D.

On February 22, 2012, state agency medical consultant Dr. Wander, conducted a RFC assessment and concluded that Plaintiff could perform a limited range of light work (Tr. 99-100).  Dr. Wander opined that Plaintiff: 1) could occasionally lift, carry or pull upward twenty pounds; 2) could frequently lift, carry or pull upward ten pounds; 3) could sit for a total of six hours in an eight-hour workday; 4) had an unlimited ability to push or pull; 5) no limitations in ability to climb ramps and stairs, stoop, kneel, crouch, crawl, communicate, see, and no

manipulative limitations; 6) was occasionally limited in ability to balance and climb; 7) had environmental limitations requiring plaintiff to avoid extreme cold, heat, hazards, and fumes, odors, dusts, gases, and poor ventilation.  (Tr. 100).

### III.     Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work

experience can perform.  *Id.*  The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence is a deferential standard of review.  *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the

Commissioner, then the Commissioner's determination is supported by substantial evidence. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## A. ALJ Bias

Plaintiff contends that the ALJ was biased and such bias prevented the ALJ from fulfilling his duty to develop the record. Pl. Brief at 10, 16-19, 22-26. Among other attacks on the ALJ's motives, Plaintiff asserts that the ALJ's bias is evident by questioning Plaintiff's full-time college attendance during the hearing. Pl. Brief at 10, 16. Plaintiff also requests for this case to be remanded before a different ALJ. Pl. Brief at 26. Finally, Plaintiff states, that the ALJ "failed to send a single interrogatory to the Plaintiff's treating physicians or seek any clarifications of their assessment of the Plaintiff's work capabilities." Pl. Brief at 23.

The Third Circuit has held that claimants are entitled to have evidence evaluated by an unbiased adjudicator. *See Hummel v. Heckler*, 736 F.2d 91, 95 (3d Cir. 1984). The right to an impartial decision-maker is of even greater importance in administrative proceedings in light of the absence of procedural safeguards which are normally available in judicial matters. *See Ventura v. Shalala*, 55 F.3d

900, 903 (3d Cir.1995).  Nonetheless, hearing officers are provided a presumption of impartiality unless a plaintiff is able to demonstrate that they have "display[ed] deep-seated favoritism or unequivocal antagonism that would make fair judgment impossible."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).  Indeed, the Supreme Court has observed that remarks by the ALJ during the hearing that are critical or even hostile to a party are, alone, ordinarily insufficient to support a bias challenge.  *Liteky v. United States*, 510 U.S. 540, 555-56 (stating that "expressions of impatience, dissatisfaction, annoyance, and even anger" are alone not enough to establish bias or partiality).  For the court to find bias on the ALJ's remarks alone, the remarks would have to show such a high degree of antagonism that a fair judgment would be impossible.  *See id.*  Upon review of the hearing and ALJ decision, the Court finds that the ALJ's conduct did not rise to a level of antagonism that would render it impossible to make a fair judgement.  *See Liteky v. United States*, 510 U.S. 540, 555-56.

To the extent that Plaintiff contends that the ALJ's lack of development is evidence of the ALJ's bias, this argument erroneously conflates the standard for judicial bias with the ALJ's duty to develop.  It is true that an adjudicator's bias

during a hearing can be so severe that such bias hinders proper development of the facts during a hearing. *See Ventura v. Shalala*, 55 F.3d 900, 904 (3d Cir. 1995) (citing to *Hess v. Sec'y of Health, Educ. and Welfare*, 497 F.2d 837 (3d Cir. 1974) to demonstrate the policy underlying the duty to develop). However, given the high standard to substantiate judicial bias, the inverse is not necessarily true; in other words, an adjudicator's lack of sufficient development does not automatically equal bias. *See Liteky v. United States*, 510 U.S. 540, 555 (explaining the criteria to demonstrate bias). An adjudicator's failure to meet a duty to develop could be due to mistake or negligence and not necessarily demonstrate "deep-seated favoritism or unequivocal antagonism that would make fair judgment impossible." *See Liteky v. United States*, 510 U.S. 540, 555.

The Third Circuit has yet to formally impose a broad duty upon the ALJ to investigate and develop arguments for all parties. *See N.J. Media Group v. Ashcroft*, 308 F.3d 198,223 (3d Cir.2002); *Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112,120 n. 2 (3d Cir.2000); *Poleck v. Astrue*, No. CIV.A. 09-291, 2009 WL 3738602, at *2-3 (E.D. Pa. Nov. 9, 2009). "While an ALJ is required to assist the claimant in developing a full record, he or she has no such obligation to

'make a case' for every claimant."  *Kenyon v. Colvin*, 2013 WL 6628057 (M.D.

Pa. 2013).  The burden still "lies with the claimant to develop the record regarding

his or her disability because the claimant is in a better position to provide

information about his or her own medical condition."  *Money v. Barnhart*, 91 Fed.

Appx. 210, 215 (3d Cir. 2004) (*citing Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5,

107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), and 20 C.F.R. §§ 404.1512(a) and

416.912(a)).  One of the regulations describing the duties of the ALJ states, in part,

that the ALJ:

> shall inquire fully into the matters at issue and shall receive in
> evidence the testimony of witnesses and any documents which are
> *relevant and material* to such matters. If the Administrative Law
> Judge believes that there is *relevant and material evidence* available
> which has not been presented at the hearing, the Administrative Law
> Judge may adjourn the hearing or, at any time prior to the mailing of
> notice of the decision, reopen the hearing for the receipt of such
> evidence.

20 C.F.R. § 410.640 (emphasis added).  The Court notes that section 410.640

requires the ALJ to seek relevant and material evidence.  20 C.F.R. § 410.640.  In

this instance, Plaintiff does not specify what relevant and material evidence is

lacking.  Specifically, although Plaintiff argues that the ALJ failed to "send a

single interrogatory to any of the Plaintiff's treating physicians," Plaintiff does not enumerate what "relevant and material" fact any additional interrogatory would establish that cannot already be discerned from the record.

With regards to Plaintiff's argument that the ALJ should "recontact" Plaintiff's physicians through interrogatories or by other methods of inquiry (Pl. Brief at 19, 23) pursuant to 20 C.F.R. § 404.1520b, section 404.1520b provides:

> (c) If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. The action(s) we take will depend on the nature of the inconsistency or insufficiency. We will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed [below]. . . .
>> (1) We may recontact your treating physician, psychologist, or other medical source. . . .

20 C.F.R. § 404.1520b. In the Third Circuit, the amount of deference a reviewing court should afford to an ALJ's decisions regarding the development of an adequate factual record in the Social Security context, e.g., whether to "recontact" any medical provider because the present record is "inadequate," is an open question. *Compare Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204-05 (3d Cir.

2008) (noting the "important prerequisite" that "recontact will proceed if 'the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled,'" but not opining on the question of deference) *and Masbeth v. Comm'r of Soc. Sec.*, No. 06-6076, 2008 WL 2637415, at *8 (D. N.J. June 27, 2008) ("because the ALJ did not find the reports . . . to be inadequate to make a determination, . . . the ALJ was not required to recontact these physicians under 20 C.F.R. §§ 404.1512(e).") *with Gray v. Astrue*, 2:10-CV-507, 2012 WL 1521259, at *3-4 (E.D. Pa. May 1, 2012). Ultimately, the question turns on whether there is substantial evidence to support the ALJ's finding.  As long as there is "'relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" there is not a requirement for the ALJ to search for more evidence.  *See Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Plaintiff does not explain how the evidence from the medical sources was inadequate, other than argue for the Court to reweigh the evidence in Plaintiff's favor.

Furthermore, Plaintiff's reliance on *Hess v. Sec'y of Health, Educ. and Welfare*, 497 F.2d 837 is not conclusive on the matter. Similarly to *Hess*, Plaintiff was not represented by an attorney at the hearing, however, in the case of *Hess*, an ALJ denied the plaintiff's benefits claim without any opinion submitted from the plaintiff's attending physician and without interviewing or examining the plaintiff. *Hess v. Sec'y of Health, Educ. and Welfare*, 497 F.2d at 840. The Third Circuit explicitly refused to hold "that the responsibility will always be upon the hearing officer to secure current medical evaluations." *Hess v. Sec'y of Health, Educ. and Welfare*, 497 F.2d 837 at 841. Instead, the Third Circuit stated that "some lesser effort might be employed" and, in a non-exclusive list of examples, noted that an ALJ might advise claimants of the importance of current medical evaluations and suggest their submission at a later date. *Hess v. Sec'y of Health, Educ. and Welfare*, 497 F.2d 837 at 841. In other words, with regard to a hearing involving a pro se claimant, an ALJ could satisfy the duty to develop by advising the pro se claimant as to how to meet his or her burden. *See Hess v. Sec'y of Health, Educ. and Welfare*, 497 F.2d 837 at 841. In this instance, the ALJ reviewed a recent

medical opinion from Plaintiff's treating physician, had an agency physician opinion, and interviewed Plaintiff during the hearing.

The ALJ's duty to develop the record was met in this instance. *See Hess v. Sec'y of Health, Educ. and Welfare*, 497 F.2d 837 at 841. Based on the foregoing, Plaintiff's duty to develop argument fails.

## B. Weight Accorded Medical Opinions

Plaintiff contends that the ALJ erred in rejecting the opinion of treating physician Dr. Mast while crediting the non-examining agency physician Dr. Wander. Pl. Brief at 17-20. Plaintiff asserts that the ALJ ignored the "abundance of medical evidence detailing the Plaintiff's severe heart conditions" and rejected "objective medical evidence by based solely on his own opinions." Pl. Brief at 17. Plaintiff continues that the "ALJ fails to rely on a single source on contradictory medical evidence. . . . [and] does not explain what medical evidence he is using to reject these findings." Pl. Brief at 19. Plaintiff continues that the ALJ:

> failed to follow Third Circuit case law in which he must specifically identify the medical evidence in which he relies upon to reject the Plaintiff's objective medical findings. The ALJ simply renders his own interpretations based on his lay opinion. Throughout the record the ALJ does "play doctor" as he interjects his own view of medical

procedures and pretends to be qualified to interpret medical testing results and how they would impact an individual.

Pl. Brief at 19.  As an initial matter, Plaintiff appears to ignore the very case law that he cites, emphasizing that an ALJ needs to cite contradictory evidence while excluding the law which states that an ALJ can reject a treating physician's opinion if unsupported by medical data.  Pl. Brief 17-18 (citing *Kurilla v. Barnhart*, No. CIV.A. 04-1724, 2005 WL 2704887, at *5 (E.D. Pa. Oct. 18, 2005)).  Plaintiff quotes the court in *Kurilla v. Barnhart* which states:

> The only reasons for an ALJ to reject a treating physician's opinion are "on the basis of contradictory medical evidence," *Plummer*, 186 F.3d at 429, or if the opinion is unsupported by medical data. *Newhouse v. Heckler*, 753 F.2d 283 (3d Cir. 1985).

*Kurilla v. Barnhart*, No. CIV.A. 04-1724, 2005 WL 2704887, at *5 (E.D. Pa. Oct. 18, 2005).  The ALJ credited rejected the January 2013 opinion of treating physician Dr. Mast.  (Tr. 28).  The ALJ describes that Dr. Mast opined that Plaintiff had "extreme" fatigue and "marked" limitation of physical activity with an ability to sit less than two hours in an eight-hour day, and an ability to stand and walk for less than 2 hours total in an 8 hour working day, need for unscheduled breaks to lie down every hour, need to elevate his legs with prolonged sitting for 2

to 4 hours during the 8 hour working day, inability to lift 10 pounds, and inability to engage in any stooping, bending, crouching, or climbing. (Tr. 29)

In support for rejecting the opinion of Dr. Mast, the ALJ explains that Dr. Mast's opinions as they are not supported by the medical evidence of record, or by Plaintiff's own testimony regarding his capabilities. (Tr. 30). The ALJ explains that although there medical records regarding treatment of Plaintiff's arrhythmia and consequent fatigue, there is nothing in the record indicating that Plaintiff cannot sit for a full day. (Tr. 30). The ALJ correctly notes that Dr. Mast's own records state that Plaintiff gets fatigued with exertion, such as lifting a garage door, and "conversely fail to indicate that symptoms are present at rest." (Tr. 30). The ALJ observed that "[a]t the visit on October 23, 2012, [Plaintiff] reported that he experienced shortness of breath on exertion especially when walking up hills at college." (Tr. 30).

With regard to pain symptoms, the ALJ noted parts in the record where Plaintiff reported that he was having no chest pain or palpitations and there is no mention in the record or doctor's recommendation or advice that Plaintiff needed to regularly elevate his legs with prolonged sitting. (Tr. 30). The ALJ noted that

when asked if either Dr. Mast or any cardiologist had given any specific work restrictions or special instructions, Plaintiff answered "no," other than dietary restrictions.  (Tr. 30).  Indeed, the first time the need to elevate legs is mentioned only in the January 2013 opinion of Dr. Mast.  Moreover, as Plaintiff argues that the ALJ failed to cite contradictory evidence, the ALJ noted that although Dr. Mast's January 2013 opinion described the ablation procedure as unsuccessful, the operative report noted that the procedure as successful. (Tr. 30 (citing Tr. 453)).

In giving credit to the February 2012 opinion of the State agency medical consultant, Dr. Wander, the ALJ took into account the new evidence submitted and crediting Plaintiff complaints of fatigue secondary to his cardiac impairments, and found that Plaintiff experienced greater limitations in standing, walking, and lifting and hand numbness and pain secondary to bilateral carpal tunnel syndrome than reflected in the February 2012 opinion.  (Tr. 28).  Thus, the ALJ found that sedentary work more accurately reflected Plaintiff's testimony of fatigue and gave Dr. Wander's opinion moderate evidentiary weight.  (Tr. 28)

The Court finds that the ALJ's allocation of weight is supported by substantial evidence.

## C. Credibility

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p. Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979); accord *Snedeker v. Comm'r of Soc. Sec.*, 244 F. App'x 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR")[7] 96-7p; *Schaudeck v. Comm'r of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999).

The credibility finding must be based on a consideration of the entire case record. SSR 96-7p. In determining a claimant's credibility regarding the severity

---

[7] Although SSA rulings do not have the force and effect of a statute or regulation, they are binding on all components of the SSA in accordance with section 402.35(b)(1) of the SSA Regulations (20 C.F.R. § 402), and are to be relied upon as precedents in adjudicating other cases.

of symptoms, the ALJ must consider the following factors in totality: 1) the extent of daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment other than medication for the symptoms; 6) measures used to relieve pain or other symptoms; and, 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Canales v. Barnhart*, 308 F. Supp. 2d 523, 527 (E.D. Pa. 2004).

While an ALJ must consider the totality of the evidence "[a] written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence" and that the ALJ's "mere failure to cite specific evidence does not establish that the ALJ failed to consider it." *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *see* SSR 06-3p ("[T]here is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision."); *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (social security

regulations enumerating factors of an ALJ to consider "require only that the ALJ's decision include 'good reasons . . . not an exhaustive factor-by-factor analysis.'").

Evidence can be used to discount credibility if such evidence demonstrates a contradiction or inconsistency. *See e.g. Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 188 (3d Cir. 2007) (finding significant a plaintiff's testimony about her daily activities was internally inconsistent, thus supporting the ALJ's determination of according her testimony little weight); *Smith v. Astrue*, 359 F. App'x 313, 317 (3d Cir. 2009) (claimant's testimony that she was essentially bedridden contradicted by evidence that she had been primary caretaker for small child for two years); *see also Orn v. Astrue*, 495 F.3d 625, 636 (stating that inconsistencies in testimony or between testimony and other evidence is proper reason to discredit a social security plaintiff); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (ALJ erred in making adverse credibility inferences from uncontradicted evidence). Activities of daily living does not equal the ability to engage in substantial gainful activity, nor do activities of daily living establish that a claimant possesses the ability to perform on a regular and continuing basis in a

work-setting. *See e.g.*, *Gonzales v. Colvin*, No. 3:13-CV-02620, at ECF No. 26 (M.D.Pa. Feb. 17, 2015) (Adopting recommendation ECF No. 24).

### 1. Work History

Plaintiff states that he "has a consistent work history beginning in 1997 while in high school until 2006, a period of nine years, when the Plaintiff began attending college at which time he suffered from a severe heart condition rendering him unable to sustain gainful employment." Pl. Brief at 3. Plaintiff argues that the ALJ failed to address Plaintiff's work history in his decision. Pl. Brief at 26.

Under ruling 96-7p, a credibility determination of an individual's statements about pain or other symptoms and about the effect the symptoms can be based on "[s]tatements and reports from the individual and from treating or examining physicians or psychologists and other persons about . . . prior work record and efforts to work . . . ." SSR 96-7p; *see also Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979) (Work history is a proper consideration in the credibility assessment). Under 20 C.F.R. §§ 404.1571, 416.971, "a claimant's ability to work on a part-time basis may constitute probative evidence of his or her ability to perform the duties of a full-time job." *Henderson v. Astrue*, No. CIV.A. 10-1638,

2011 WL 6056896, at *6 (W.D. Pa. Dec. 6, 2011); 20 C.F.R. §§ 404.1571, 416.971 ( "[e]ven if the work you have done was not substantial gainful activity, ait may show that you are able to do more work than you actually did."); *see also Lyons v. Heckler*, 638 F. Supp. 706, 711 (E.D. Pa. 1986) ("If a claimant performs work during any period in which she alleges that she was disabled, the work performed may demonstrate that she is able to engage in substantial gainful activity").

The inferences drawn from a claimant's work history vary depending on the facts. *See e.g.*, *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (holding that a claimant's testimony "is entitled to substantial credibility" where the claimant has a lifetime record of continuous work); *Ford v. Barnhart*, 57 F. App'x 984, 988 (3d Cir. 2003) (finding no error where an ALJ made an adverse credibility determination based on erratic pre-onset work history); *Crotsley v. Astrue*, No. CIV.A. 3:10-88, 2011 WL 5026341, at *4 (W.D. Pa. Oct. 21, 2011) (an inference of a lack of motivation to work can be drawn from a sporadic work history prior to disability onset); *Collins v. Astrue*, No. CIV.A. 11-1275, 2012 WL 2930885, at *11 (W.D. Pa. July 18, 2012) (an inference of a lack of motivation to work can be drawn from a sporadic work history prior to disability onset);

*Henderson v. Astrue*, No. CIV.A. 10-1638, 2011 WL 6056896, at *6 (W.D. Pa. Dec. 6, 2011) (post onset part-time work could support a finding of non-disability); *Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989) (sporadic work-history as evidence of mental impairment; *Smith v. Heckler*, 735 F.2d 312, 318 (8th Cir. 1984) (finding error where ALJ determined that a claimant lacked motivation, however the ALJ failed to address claimant's history of work attempts and testimony which supported that claimant simply lacked basic mental ability to follow directions without constant supervision).

Plaintiff cites to *Rieder v. Apfel* in support that Plaintiff's work history is probative regarding Plaintiff's motivation to work. Pl. Brief at 26 (citing *Rieder v. Apfel*, 115 F.Supp.2d 496, 505 (M.D. Pa. 2000)). However, the court in *Rieder v. Apfel*, stated that "[w]hen a claimant has worked *for a long period of time*, his testimony about his work capabilities should be accorded substantial credibility." *Rieder v. Apfel*, 115 F. Supp. 2d 496, 505 (M.D. Pa. 2000) (emphasis added). The Plaintiff in *Rieder v. Apfel* "almost always had a job" from high school until disability onset at forty-one years of age. *Rieder v. Apfel*, 115 F. Supp. 2d 496, 498-99, 505 (M.D. Pa. 2000). As support of a long period of working as probative

of a claimant's credibility, the court in *Rieder v. Apfel* cited to *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979), a case were a claimant worked "twenty-nine years of continuous work, fifteen with the same employer." *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). Unlike the claimants in *Rieder* and *Dobrowolsky* who worked for over twenty years and stopped working as a result of disabling impairments, in this instance, Plaintiff worked ten years (Tr. 168, 172-75), stopped working as a result of being fired for sexual harassment, followed by collecting unemployment compensation and attending school full-time (Tr. 30, 43, 46-47). The ALJ noted that Plaintiff "left his last job because he was terminated for sexual harassment alleged by another employee, rather than by any medical condition." (Tr. 30-31). The Court finds no error in the ALJ not crediting Plaintiff's ten years of working prior to getting fired.

### 2. Post Onset Full-Time College Attendance

It appears that Plaintiff argues that it was error for the ALJ to inquire about Plaintiff's full-time college attendance during the hearing. Pl. Brief at 10, 16. In the decision the ALJ noted that at the visit on October 23, 2012, Plaintiff "reported that he experienced shortness of breath on exertion especially when walking up

hills at college" and that "[d]espite his alleged impairments, symptoms, and limitations, [Plaintiff] testified at the hearing that he attended college full-time through December 2012 . . . ." Pl. Brief at 30. The ALJ determined that Plaintiff's participation in college and other activities "diminishes the credibility of his allegations regarding problems with memory, attention and concentration." (Tr. 30).

Several courts have found that conduct involved with college attendance can contradict a plaintiff's testimony and in such cases, it is permissible for an ALJ to draw adverse credibility inferences. *See e.g.*, *Breen v. Comm'r of Soc. Sec.*, 504 F. App'x 96, 99 (3d Cir. 2012) (the ALJ's consideration of a claimant's college attendance, good grades in challenging courses, and participation in a number of social activities was not improper); *Hare v. Comm'r of Soc. Sec.*, 37 F. App'x 773, 776 (6th Cir. 2002) (upholding ALJ decision where ALJ concluded that college attendance and graduation two years after disability onset discredited a claimant's testimony that she could not use her right arm or to write); *Tennant v. Apfel*, 224 F.3d 869, 870-71 (8th Cir. 2000) (finding it was "proper for the District Court to consider Plaintiff's part-time college attendance, as carrying 17 credit hours of

chiropractic classes while maintaining a C average appears inconsistent with allegedly disabling joint pain and fatigue); *Baker v. Apfel*, 159 F.3d 1140, 1145 (8th Cir.1998) (where ALJ relied in part on claimant's ability to attend four hours of classes daily in finding him capable of performing full range of light work, substantial evidence supported ALJ's conclusion); *Goodale v. Astrue*, 32 F. Supp. 3d 345, 354 (N.D.N.Y. 2012) (concluding that substantial evidence supported ALJ determination that claimant was not entirely credible in his complaints of chronic severe fatigue where after his alleged onset date, was a full-time college student, made the Dean's List, and graduated summa cum laude).

The ALJ did not err in inquiring about Plaintiff's college participation and did not err in making adverse inferences from the degree Plaintiff's participation in college.

### D. Vocational Expert (VE) Hypothetical and RFC

Plaintiff argues that "[t]he ALJ does not even address the Plaintiff's constant sleep problems which he testified extensively about with the Plaintiff's "extreme" fatigue noted throughout the record." Pl. Brief at 19. Plaintiff also argues:

the ALJ failed to ask an accurate hypothetical question taking into account all of the Plaintiff's impairments including the limitations imposed by the Plaintiff's routine sleep difficulties; the Plaintiff's difficulty concentrating and the Plaintiff's medications which cause additional fatigue. These conditions affect the Plaintiff's ability to function on a daily basis and should have been incorporated in the hypothetical presented to the Vocational Expert.

Pl. Brief at 28.  Plaintiff also argues that the ALJ "failed to identify any objective medical evidence that supports his conclusion of residual functional capacity (RFC)."  Pl. Brief at 17.

As addressed above, the ALJ did address Plaintiff's allegations of fatigue, the side-effects of his medication producing fatigue, and difficulty concentration, and the Court finds substantial evidence supports the ALJ's discrediting the severity of these symptoms.

The Third Circuit has explained that "objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself."  *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005).  Where a plaintiff contends that the VE "testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational

expert," such are challenges to the RFC assessment itself. *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005).

In order for a vocational expert's answer to a hypothetical to be considered substantial evidence, the question must reflect "*all* of the claimant's impairments that are supported by the record." *Allen v. Barnhart*, 417 F.3d 396, 407 (3d Cir. 2005) (emphasis in original). Additionally, "'great specificity' is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical." *Ramirez v. Barnhart*, 372 F.3d 546, 554-55 (3d Cir. 2004) (internal citations omitted); *see also* SSR 96–8p (requiring a "more detailed assessment" of the claimant's mental limitations at step five of the disability analysis).

In this instance, Plaintiff's objection to the VE hypothetical is an attack on the RFC which the Court addressed in the above analysis of the ALJ's credibility determination and allocation of weight to the medical opinions in support of the ALJ's RFC determination. For the reasons discussed above, the ALJ's RFC is supported by substantial evidence and where the credited medical opinion did not indicate that Plaintiff's limitations would preclude Plaintiff from attending work on a regular basis, the ALJ did not err relying on Dr. Wander's opinion to form the

RFC and in formulating the hypothetical to the VE.

Plaintiff further argues that although he "offered extensive testimony at the hearing about his severe pain," such was "completed ignored and unaddressed by the ALJ." Pl. Brief at 27.   Plaintiff continues:

> There was not a single piece of medical evidence which contradicted the Plaintiff's severe pain on a daily basis. The ALJ failed to identify any contrary medical evidence to rebut the Plaintiff's testimony. The ALJ has absolutely no basis for rejecting all of the Plaintiff's testimony which is fully supported by the medical evidence as well as the evidence throughout the record.

Pl. Brief at 27.  Contrary to Plaintiff's assertions (Pl. Brief at 19, 27), the ALJ, in fact, noted Plaintiff's allegations of disabling pain and fatigue, stating that Plaintiff alleged "debilitating fatigue, weakness, shortness of breath, headaches and joint and muscle pain" and that he testified to experiencing "muscle weakness, pain, numbness and tingling in the upper and lower extremities, worse on the right, and problems with balance and low stamina/exhaustion."   (Tr. 28).   The ALJ extensively reviewed the medical evidence and the prescribed medications, and Plaintiff does not direct the Court to any evidence of ongoing pain prescriptions or seeking treatment to alleviate pain.   The ALJ did address Plaintiff's testimony

regarding pain and fatigue symptoms and limitations, and even stated that he credited Plaintiff's testimony to add greater limitations than those opined by Dr. Wander. (Tr. 28).

As support for finding that Plaintiff's assertions of debilitating pain and fatigue are less severe as alleged, the ALJ cited to Dr. Wander's opinion (Tr. 28), which the Court explains above, that the ALJ's reliance on Dr. Wander's opinion is supported by substantial evidence. Moreover, the ALJ noted that as recent as October 2012, Plaintiff reported that he experienced shortness of breath upon exertion, especially when walking up the hills, in contrast to Plaintiff complaining of symptoms while he is sedentary. (Tr. 29). The ALJ also noted Plaintiff reported to tolerating his medications well and noted records indicating that the ablation procedure performed on January 24, 2013, resulted in a successful conversion to normal sinus rhythm. (Tr. 29). Substantial evidence supports the ALJ's RFC.

///

///

///

## E. Sound quality for Video Hearing

Plaintiff argues that:

> [t]he ALJ ignores the non-attorney representative's complaint that they continued to hear echoing sounds when speaking which was distracting. The ALJ simply continued with the hearing ignoring this complaint and only asked about the technical issues at the conclusion of the hearing. The ALJ should have stopped the hearing at the time of the complaint and resolved the issue or otherwise continue to hearing to a later date where no technical difficulties would occur.

Pl. Brief at 21. The hearing transcript regarding sound quality is as follows:

> ALJ: Thank you. I need you to speak up a little bit louder because I can just barely hear you.
> CLMT: Okay.
> ALJ: Let me turn the volume up a little bit. Can you hear me okay?
> CLMT: Yes.

(Tr. 41).

> REP: Judge, I don't know if you can hear. There's an echo on our end. I don't know if you can hear it but it's a little distracting so if --
> ALJ: Well --
> REP: -- we're a little hesitant that's why, okay?
> ALJ: Okay. You hear the echo when I speak?
> REP: No, when we speak.
> ALJ: Oh, when you speak, okay . Yeah, I'm not hearing anything.
> REP: Okay.
> ALJ: I mean I'm not hearing any echo. I am hearing the testimony. All right. Thank you for pointing that out.

(Tr. 44).

> ALJ: All right. As I mentioned -- okay. As I mentioned earlier, am I
> still making an echo?
> REP: Every now and then.

(Tr. 67).  Although Plaintiff heard an echo in his and his representative's voice,

from the beginning of the hearing, the ALJ was made aware that the echoing was

distracting and would cause them to hesitate in responding.  (Tr. 44).  The ALJ

stated that he could hear Plaintiff clearly (Tr. 44), the transcript does not show any

substantial omissions due to the sound quality, Plaintiff and his representative were

able to hear the ALJ to respond to questions for the duration of the hearing (Tr. 37-

70), and towards the end of the hearing, when the ALJ inquired about the sounds

quality, Plaintiff's representative said that the echo was present "every now and

then" (Tr. 67).  The Court does not find any irregularities that would amount to a

reversible error.

## IV.    Recommendation

Therefore, the Court finds that the ALJ made the required specific findings

of fact in determining whether Plaintiff met the criteria for disability, and the

findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3);

*Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and,

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: August 31, 2015        _____ s/Gerald B. Cohn _____
                         GERALD B. COHN
                UNITED STATES MAGISTRATE JUDGE